**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

EDWARD M. ZINNER,

               Plaintiff,

   v.

RICHARD P. OLENYCH

and

LONE TREE PRINTING, INC.,

               Defendants.

CIVIL ACTION NO. 2:14-CV-00163
(MSD)(TEM)

## **DEFENDANTS RICHARD P. OLENYCH AND LONE TREE PRINTING, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**WONG FLEMING**
Mark W. Thompson, Esq.
VA Bar # 66750
Linda Wong, Esq. (*admitted pro hac vice*)
821 Alexander Road, Suite 200
Princeton, New Jersey 08540
Tel.: (609) 951-9520
Fax: (609) 951-0270
*Attorneys for Defendants Richard P. Olenych and Lone Tree Printing, Inc.*

# TABLE OF CONTENTS

PROCEDURAL HISTORY.................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................... 2

ARGUMENT.................................................................................................... 12

    POINT I........................................................................................................ 12

    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT DISMISSING COUNT I OF THE COMPLAINT BECAUSE THERE IS NO MERIT TO PLAINTIFF'S CLAIM UNDER 15 U.S.C. § 8131 ..............................................12

        A.  Standard for Summary Judgment.......................................................12

        B.  Defendants are entitled to Summary Judgment on Plaintiff's 15 U.S.C. § 8131 Claim...........................................................................................13

    POINT II. ..................................................................................................... 23

    THIS COURT SHOULD DISMISS COUNT II ASSERTING CLAIMS UNDER 15 U.S.C. § 1125(d)...........................................................................................23

    POINT III. .................................................................................................... 27

    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF DAMAGES BECAUSE ZINNER IS NOT ENTITLED TO SUCH RELIEF UNDER 15 U.S.C. §§ 8131 AND 1125(d) .........................................................................27

        A.  No Damages Are Available for Personal Name Violations under 15 U.S.C. § 8131................................................................................................27

        B.  Damages Are Also Unavailable for Zinner's Claim Under 15 U.S.C. § 1125(d)............................................................................................28

CONCLUSION................................................................................................. 29

## TABLE OF AUTHORITIES

**Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ..........................................12, 13

Bogoni v. Gomez, 847 F. Supp. 2d 519 (S.D.N.Y. 2011) ...............................14, 15, 16

Brooks v. Creative Arts By Calloway, LLC, 93 U.S.P.Q.2d (BNA) 1823 ....................24

Carl v. Bernardjcarl.com, 662 F. Supp. 2d 487 (E.D.Va. 2009)............................ passim

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ..........................................................12

DSPT Int'l, Inc. v. Nahum, 624 F.3d 1213 (9th Cir. 2010) .......................................17

Flynn v. AK Peters, Ltd., 377 F. 3d 13 (1st Cir. 2004) .............................................24

Harrods Ltd. v. Sixty Internet Domain Names, 110 F. Supp.2d 420 (E.D. Va. 2000) .................16

John Curry Skating Co. v. John Curry Skating Co., 626 F. Supp. 611 (D.D.C. 1985) .................24

Lamparello v. Falwell, 360 F. Supp. 2d 768, n. 18 (E.D. Va. 2004) .......................15, 23

Lamparello v. Falwell, 420 F.3d 309, n. 7 (4th Cir. Va. 2005) ...............................13, 14

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 L.Ed.2d 538 (1986)..........12, 13

Perini Corp. v. Perini Constr., Inc., 915 F.2d 121 (4th Cir. 1990)............................24

Pro-concepts, LLC v. Resh, 2013 U.S. Dist. LEXIS 151714 (E.D. Va. 2013) ...........................13

Radio Computing Servs. v. Roland Computing Servs., 66 U.S.P.Q.2d (BNA) 1478
  (S.D.N.Y. 2003) ...................................................................................19

Schmidheiny v. Weber, 285 F. Supp. 2d 613 (E.D. Pa. 2003) .....................................16

Solid Host, NL v. Namecheap, Inc., 652 F. Supp.2d 1092 (C.D. Cal. 2009)..............................19

Taylor v. List, 880 F.2d 1040 (9th Cir. 1989)......................................................13

TMI, Inc. v. Maxwell, 368 F. 3d 433 (5th Cir. 2004)........................................16, 19, 22

Utah Lighthouse Ministry v. Found. For Apologetic Info. & Research, 527 F.3d 1045
  (10th Cir. 2008) ..............................................................................16, 21

Venetian Casino Resort, LLC v. VenetianGold.com, 380 F. Supp. 2d 737 (E.D.Va.
  2005).............................................................................................15, 23

Virtual Works, Inc. v. Volkswagen of Am. Inc., 238 F.3d 264 (4th Cir. 2001)............................13

**Statutes**

15 U.S.C. § 1051 ............................................................................... passim

15 U.S.C. § 1117 ................................................................................... 31

15 U.S.C. § 1125 ............................................................................... passim

15 U.S.C. § 8131 ............................................................................... passim

**Rules**

Fed. R. Civ. P. 56 ................................................................................. 12

Federal Rule of Evidence 408(a) ................................................................... 21

**Legislative Materials**

S. Rep. No. 106-140 (1999), 1999 WL 594571, at *8 ................................................................. 15

## **PROCEDURAL HISTORY**

This action was commenced on April 21, 2014, when Plaintiff Edward M. Zinner filed a Complaint in the U.S. District Court for the Eastern District of Virginia, against Defendants Richard P. Olenych and Lone Tree Printing, Inc.   Defendants, on May 66, 2014, filed a motion for an extension of time to file a responsive pleading to the Complaint, which was granted by the Court on May 22, 2014.  On June 12, 2014, Defendants filed their Answer to the Complaint.

On July 21, 2014, Plaintiff filed a Motion to Compel, which was ultimately withdrawn on July 24, 2014.

The parties appeared for a settlement conference on October 28, 2014, before Magistrate Judge Tommy E. Miller. This action was reassigned to Magistrate Judge Douglas E. Miller, on October 28, 2014, after the settlement conference was held.

On December 31, 2014, Defendants filed this Motion for Summary Judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Defendant Richard Olenych ("Defendant Olenych") and Plaintiff Ed Zinner ("Plaintiff Zinner") commenced a business relationship in or around 2010, when Defendant Lone Tree Printing ("Lone Tree") provided printing services to Ocean Equity Group ("OEG") and Ocean Equity Payment Solutions, LLC ("OEPS").   (Ex. 1, 8/28/14 Olenych Dep. Tr. 25:3-6; Ex. 2, 9/25/14 Zinner Dep. Tr. 40:23-24).

2.     Plaintiff Zinner has at all times relevant to this matter been the owner or part-owner of OEG and OEPS.  (Ex. 2, 9/25/14 Zinner Dep. Tr. 17:14-18, 18:16-18).

3.     Defendant Olenych is a principal owner of Defendant Lone Tree Printing, Inc. (Ex. 1, 8/28/14 Olenych Dep. Tr. 5:9-16).

4.     According to OEG and OEPS, between 2012 and March 1, 2013, Defendant Olenych's son, Perry Olenych, was employed as an independent contractor for OEPS. (Ex. 6, Third Amended Complaint in Ocean Equity Payment Solutions, et al. v. Wilson, et al.).

5.     According to OEG and OEPS, Perry Olenych left his employment with OEPS on or about March 1, 2013, and, along with Defendant Richard Olenych and another former employee of OEPS, Doug Wilson, subsequently formed a new corporate entity, Ally Merchant Services, LLC ("Ally").  (Ex. 6, Third Amended Complaint in Ocean Equity Payment Solutions, et al. v. Wilson, et al.; see also Ex. 3, 11/24/14 Olenych Dep. Tr. 20:16-25).

6.     Defendant Olenych is a minority shareholder of Ally, but is otherwise uninvolved with its operations.  (Ex. 3, 11/24/14 Olenych Dep. Tr. 31:16-21).

7.     Olenych believed that Zinner had given his blessing to Olenych's son and Wilson in their business venture with Ally.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 28:1-2; Ex. 3, 11/24/14 Olenych Dep. Tr. 19:18-24).

8.      On or about August 29, 2013, Plaintiff Zinner's businesses, OEG and OEPS, filed a lawsuit in Virginia Circuit Court against Perry Olenych and Doug Wilson alleging breach of contract and tortious interference with business relations.  (Ex. 6, Third Amended Complaint in Ocean Equity Payment Solutions, et al v. Wilson, et al; Ex. 7, Docket Report from Ocean Equity Payment Solutions, et al. v. Wilson, et al.).

9.      This lawsuit was eventually amended to name Olenych and Ally as additional parties on March 31, 2014.  (Ex. 6, Third Amended Complaint in Ocean Equity Payment Solutions, et al v. Wilson, et al).

10.     On December 18, 2014, OEG and OEPS nonsuited their claims in Ocean Equity Payment Solutions, et al. v. Wilson, et al.  (Ex. 7, Docket Report).

11.     Zinner was a customer first, and then a friend to Olenych.  (Ex. 1, 8/24/14 Olenych Dep. Tr. 8:3-4, 27:3-7).

12.     Zinner told Olenych at least a dozen times that he liked Perry and indicated he would not do anything to hurt Olenych's family. (Ex. 1, 8/28/14 Olenych Dep. Tr. 25:3-6).

13.     Olenych believed that Zinner had promised never to "go after [Olenych's] family" and that Zinner loved Olenych's son, Perry, and at one point insinuated that his son and Zinner's daughter should date.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 26:17-20, 29:15-20).

14.     As such, Olenych viewed the lawsuit by Zinner's businesses against his son as a betrayal and an attack on his family and that it rendered Zinner's previous statements about Olenych's son to be lies.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 85:1-16.).

15.     Olenych had discussed Zinner's betrayal with his brother, Jack, who was outraged by Zinner's conduct, and when Jack passed away in July of 2013, Olenych began to think about writing a book about Zinner.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 27:19-25.)

3

16.     In response to Zinner's personal betrayal to Olenych and his son, Perry, and information he received on the internet that Zinner had not paid restitution to victims he had defrauded pursuant to Zinner's health care fraud conviction, Olenych, in September or October of 2013, began to draft a fictionalized novel, entitled "EZ the Hard Way," about his relationship with Zinner.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 28:18, 19-25).

17.     Olenych had previously published one novel, Joe Sales, and written several others and numerous published articles. (Ex. 1, 8/28/14 Olenych Dep. Tr. 32:11-14; Ex. 8, LTP 436-37; Ex. 9, sample of published articles written by Olenych).

18.     In or about January or early February 2014, Olenych came across material that he believed indicated Zinner had failed to pay restitution for a previous criminal conviction.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 25:14-24, 28:21-24).

19.     "EZ the Hard Way" is in draft form, is not ready for publication and has never been shown to anyone, except for the purposes of this litigation.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 33:3-25, 34:1-14.)

20.     "EZ the Hard Way" was always intended to be a work of fiction. (Ex. 1, 8/28/14 Olenych Dep. Tr.  34:15-25.)

21.     Olenych wrote "EZ the Hard Way" to "get things off his chest" and relieve frustration. (Ex. 1, 8/28/14 Olenych Dep. Tr. 78:1-8.)

22.     It was not uncommon for Olenych, as an author, to delete chapters and re-map a book during the writing process. (Ex. 1, 8/28/14 Olenych Dep. Tr. 83:17-22.)

23.     Olenych and his businesses own other domain names, but do not own any  domain names with a person's name in it other than Olenych's own name.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 51:3-17).

24.     On March 13, 1995, Plaintiff Ed Zinner entered into a guilty plea agreement in the United States District Court for the Eastern District of Pennsylvania, in which he pleaded guilty to charges of racketeering arising from his operation of a Multiple Employer Welfare Arrangement.  (Ex. 10, guilty plea agreement in US v. Zinner; Ex. 2, 9/25/14 Zinner Dep. Tr. 127:2-11).

25.     As a result of his conviction, Zinner was sentenced to a 68 month term of imprisonment, and was ordered to pay $485,000 in restitution.  (Ex. 11, Judgment in a Criminal Case in US v. Zinner; Ex. 2, 9/25/14 Zinner Dep. Tr. 127:2-11).

26.     On or about January 24, 2014, the City of Virginia Beach, VA recorded a lien for "FINE AND/OR RESTITUTION" against Zinner filed by the United States Attorneys Office for the Eastern District of Pennsylvania in the amount of $205,932.63.  (Ex. 12, Notice of Lien for Fine and/or Restitution).

27.     After determining that Zinner had failed to pay restitution, Olenych decided to create a website to educate the public about Zinner and to eventually promote his fictionalized novel.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 37:5-10).

28.     Olenych sought to educate the public about Zinner's failure to pay restitution to the victims of his crimes, to show how Zinner uses litigation as a bullying tactic and to intimidate persons, and write about other improper personal conduct.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 36:10-43:8.)

29.     Because Mr. Zinner was to be the primary subject of the website, Olenych, through Lone Tree, purchased the domain name "edzinner.com" from the hosting service "HostPapa" on or about March 6, 2014.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 50:7-17).

30.    At the time he purchased the domain name "edzinner.com," Defendants had no intention to use the domain name for any purpose other than "telling the truth" about Zinner and, eventually, to promote Olenych's novel, and did not have any intent to profit from the website or sell it.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 50:7-17; see also Ex. 3, 11/24/14 Olenych Dep. Tr. 112:20-22).

31.    At the time they purchased the domain name "edzinner.com," Defendants provided accurate registration information, including their name, address, and other contact information.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 53:15-18; Ex. 4, Brown Dep. Tr. 24:13-4; Ex. 13, LTP 484-88).

32.    However, in light of Zinner's previous prior practice of bullying persons, including Olenych and his son, by filing lawsuits against them, Olenych opted to pay HostPapa an additional fee for HostPapa to instruct the domain registrar, Tucows, Inc., to keep the registration information private.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 54:19-55:1; Ex. 13, LTP 484-88).

33.    The sole content on the website at the time stated:

> Does history repeat itself?
> It does with Ed Zinner, And that is what this page is all about.
> We Will review his documented statements and actions prior
> To his Multiple Employer Welfare Arrangement industry or
> MRWA conviction.  The book "Broken Promises:
> Fraud by Small Business Health Insurers," by Robert Tillman
> Devoted a whole chapter to Edward M. Zinner.
> Here's the link: http://books.google.com/books?
> …
> "It's not only about Ed Zinner's felony conviction that we are
> going to review, it is his blatant lies and outrageous antics that
> continue today that need to be exposed.  If Mr. Zinner had simply
> done his jail time and reformed this web site would not be here.
> He chose not too.  So his past will be revealed in chronological

6

Order.  We hope to demonstrate to the world that Ed Zinner has
Not changed or repented for his actions and continues with his old habits.

(Ex. 14, printout of website attached to Complaint).

34.    The website did not state that the domain name was available for purchase, and did not provide information through which Defendants could be identified.  (See id.; see also Ex. 4, Brown Dep. Tr. 14:20-15:2).

35.    At no time prior to March 26, 2014 did Olenych or any person purporting to represent Olenych contact Zinner or any representative of Zinner.  (Ex. 5, 11/24/14 Zinner Dep. Tr. 15:6-9; Ex. 4, Brown Dep. Tr. 36:6-12).

36.    On or about March 25, 2014, Sam Brown, an attorney then representing Zinner in the Virginia Circuit Court litigation, sent an e-mail to the domain registrar, Tucows, demanding that Tucows provide him with the name of the domain name registrant and further demanding that Tucows forward his e-mail to the domain name registrant.  (Ex. 15, March 25, 2014 email from Brown to Tucows – ZINNER 819-820).

37.    The e-mail further demanded that the registrant "respond by . . . Friday, March 28, 2014."  (Id.).

38.    Tucows did, in fact, forward Brown's March 25, 2014 e-mail to Defendant Olenych.  (Ex.16, LTP 468-76).

39.    Tucows also advised Brown by e-mail that the domain name had enabled privacy protections, but informed Brown that it had forwarded Brown's March 25, 2014 e-mail to the registrant, and further informed Brown that he could directly contact the registrant through a form that Tucows linked to its response.  (Ex. 15).

40.     Neither Brown nor Zinner ever attempted to contact the registrant using the contact link Tucows provided.  (Ex. 4, Brown Dep. Tr. 33:20-24; Ex. 5, 11/24/14 Zinner Dep. Tr. 12:19-25).

41.     Brown intended that the domain registrant would contact him or Zinner as a result of his demand to Tucows.  (Brown Dep. Tr. 34:18-35:16).

42.     On the morning of March 27, 2014, Olenych informed Tucows that an attorney would be contacting Brown on Defendants' behalf by April 4, 2014.  (Ex. 16).

43.     Tucows then, still on the morning of March 27, 2014, advised Brown that the registrant's attorney would contact Brown by April 4, 2014, and Brown responded by stating that the domain "may be subject to criminal activity and I would ask that you reveal the source as soon as possible to avoid litigation."  (Ex. 15).

44.     Brown refused, in his deposition, to identify any basis for "possible litigation" against Tucows.  (Ex. 4, Brown Dep. Tr. 37:15-38:5).

45.     Neither Brown nor Zinner have ever provided a basis for the suggestion that the domain "may be subject to criminal activity."

46.     On the afternoon of March 27, 2014, Tucows' representative, Sara Scruton, advised Olenych that Brown was threatening litigation against Tucows and demanded that Olenych contact Brown "by the end of the day, or I will be removing the privacy from your domain."  (Ex. 16).

47.     In light of the threats to remove the privacy from Defendants' domain name, Olenych altered the registration information to a fictitious name and address in order to continue to protect Defendants' privacy. ((Ex. 1, 8/28/14 Olenych Dep. Tr. 55:18-23).

48.     The content from the domain name was only on the internet for several weeks in March 2014 and was removed by Olenych that same month it was originally posted. (Ex. 1, 8/28/14 Olenych Dep. Tr. 29:17-24; 59:11-25).

49.     Early on the morning of March 28, 2014, Olenych advised Tucows that he had hired an attorney, Justin Fernandez, who would "reach out to Sam Brown today," and provided Tucows with Fernandez's contact information. (Ex. 16).

50.     On the morning of March 28, 2014, Fernandez left a voicemail for Brown stating that he was calling "regarding the domain name edzinner.com. Uh, I'm representing a client who is interested in selling the domain name" and providing Brown with his phone number. (Ex. 17, transcript of voicemail attached to complaint).

51.     Brown acknowledged that the March 28, 2014 voicemail from Fernandez was a response to Brown's inquiry to Tucows. (Ex. 4, Brown Dep. Tr. 35:23-25).

52.     Brown gave inconsistent testimony about the number of times he spoke with Fernandez by telephone, but did so on at least one occasion. (Compare Ex. 4, Brown Dep. Tr. 48:20-22 with same at 52:9-11).

53.     The primary subject discussed in Brown's telephone conversations with Fernandez was whether Fernandez was required to disclose his client's name. (Ex. 4, Brown Dep. Tr. 48:20-49:9).

54.     Fernandez never provided Brown with a specific offer to sell the website. (Ex. 4, Brown Dep. Tr. 50:9-11).

55.     Brown acknowledged that Fernandez never made a "specific statement . . . to [the] effect" that Fernandez' client was "looking for" "substantial monies" as payment to sell the domain name. (Ex. 4, Brown Dep. Tr. 50:16-20).

56.     On April 2, 2014, Tucows indicated in an e-mail to Fernandez that Brown was "threatening litigation against Tucows" and removed the privacy protections from the domain name. (Ex. 16).

57.     On April 2, 2014, Brown sent an e-mail to Tucows claiming that the registrant information for the domain name was inaccurate.  (Ex. 18, ZINNER 826-29).

58.     Tucows advised Defendants of Brown's claims about the inaccurate registrant information on the afternoon of April 2, 2014.  (Ex. 16).

59.     Olenych then promptly corrected the registration information and on April 3, 2014, Tucows provided Brown with the corrected and updated registration information.  (Ex. 1, 8/28/14 Olenych Dep. Tr. 56:15-19).

60.     Zinner subsequently demanded that the Internet Corporation for Assigned Names and Numbers ("ICANN") cancel the registration of "edzinner.com" and threatened to file suit against ICANN if it did not do so.  (Ex. 19, emails from Zinner to ICANN, ZINNER 777-781).

61.     Zinner acknowledged that he had no basis to threaten litigation against ICANN and that he did not in fact do so even though ICANN never cancelled the registration of "edzinner.com." (Ex. 5, 11/24/14 Zinner Dep. Tr. 16:4-17:16).

62.     Between the 1990s and the present, Zinner has occasionally performed live music as a member of several bands.  (Ex. 2, 9/25/14 Zinner Dep. Tr. 15:3-8, 248:5-7, 250:5-11).

63.     Zinner has almost never performed as a solo act.  (Ex. 2, 9/25/14 Zinner Dep. Tr. 242:10-15).

64.     Zinner has acknowledged that he is not "famous" for his work as a musician. (Ex. 2, 9/25/14 Zinner Dep. Tr. 247:6-7).

65.     Zinner has not been paid as a performer of live music at all in 2014, and testified that he earned only "two to 3,000" dollars as a performer in 2013.  (Ex. 2, 9/25/14 Zinner Dep. Tr. 245:2-4).

66.     Zinner testified that the groups with which he performed "didn't really do much of anything" in terms of marketing their performances.  (Ex. 2, 9/25/14 Zinner Dep. Tr. 250:19-251:5).

67.     Zinner also acknowledged that "there's no reason" his name would even appear on a contract for a performance by one of his bands.  (Ex. 2, 9/25/14 Zinner Dep. Tr. 260:23-261:3).

68.     Nonetheless, on April 2, 2014, around a month after he became aware of the domain name "edzinner.com," Zinner submitted a trademark application for his personal name "Ed Zinner" with the United States Patent and Trademark Office for "Entertainment services in the nature of live musical performances."  (Ex. 20, Trademark Application for "Ed Zinner").

69.     Zinner's trademark application remains pending as of the date of filing the instant motion.  (Ex. 21, printout of USPTO docket).

70.     Zinner testified that he projects his income for 2014 from his business endeavors will increase by over $100,000 as compared to 2013.  (Ex. 2, 9/25/14 Zinner Dep. Tr. 38:14-25).

71.     Zinner has not established that he lost any revenue from as an entertainer or his personal or professional endeavors based on the content of the website, edzinner.com.

72.     On or about October 30, 2014, Zinner filed a third action against Olenych and a second action against Lone Tree Printing, Inc., in the Circuit Court of the City of Virginia Beach, claiming defamation based upon the website, edzinner.com. Zinner v. Olenych and Lone Tree Printing, Inc., Case No. CL14-5051. Defendants filed a Motion to Dismiss, which is pending.

## ARGUMENT

### POINT I.

**DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT DISMISSING COUNT I OF THE COMPLAINT BECAUSE THERE IS NO MERIT TO PLAINTIFF'S CLAIM UNDER 15 U.S.C. § 8131**

*A.  Standard for Summary Judgment*

Pursuant to *Fed. R. Civ. P. 56*, a court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. Material facts are "facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the initial burden of identifying the portions of the pleadings and evidence that the party believes to demonstrate the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Fed. R. Civ. P. 56(c)(1)(A)-(B)*. Once the moving party has properly supported the motion, the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89

L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.  The nonmoving party cannot defeat a motion for summary judgment "by relying solely on conclusory allegations unsupported by factual data." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) . "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356.

B.   *Defendants are entitled to Summary Judgment on Plaintiff's 15 U.S.C. § 8131 Claim*

This Court should dismiss Count I of the Complaint because there are no material facts in dispute, and as a matter of law Defendants are entitled to judgment dismissing Plaintiff's claim under 15 U.S.C. 8131 of the Anticybersquatting Consumer Protection Act ("ACPA"). Specifically, Plaintiff cannot meet his burden of showing that Defendants acted with bad faith or specific intent to profit in registering the domain name, edzinner.com.

Congress enacted the ACPA in 1999 to prevent "cybersquatting," a "practice of registering 'well-known brand names as Internet domain names' in order to force the rightful owners of the mark to 'pay for the right to engage in electronic commerce under their own brand name.'" Pro-concepts, LLC v. Resh, 2013 U.S. Dist. LEXIS 151714 (E.D. Va. 2013) quoting Virtual Works, Inc. v. Volkswagen of Am. Inc., 238 F.3d 264, 267 (4th Cir. 2001).  In addition, our courts have recognized that Congress "left little doubt that it did not intend for trademark laws to impinge the First Amendment rights of critics and commentators."  Lamparello v. Falwell, 420 F.3d 309, n. 7 (4th Cir. Va. 2005).  Thus, in determining whether an individual has engaged in cybersquatting, the courts should consider whether the person's use of the mark is a "bona fide noncommercial or fair use."  Id., citing 15 U.S.C. § 1125(d)(1)(B)(i)(IV).   "The

legislature believed this provision necessary to "protect[] the rights of Internet users and the interests of all Americans in free speech and protected uses of trademarked names for such things as parody, comment, criticism, comparative advertising, news reporting, etc." Id., citing S. Rep. No. 106-140 (1999), 1999 WL 594571, at *8.  This case should be dismissed because Defendants were engaged in non-commercial use of the domain name at issue, in order to exercise their First Amendment Rights.

Plaintiff must demonstrate, under § 8131(1)(A), that Defendants (1) registered a domain name that consists of the name of the plaintiff, (2) did so without Plaintiff's consent and (3) had specific intent to profit from such name. 15 U.S.C. § 8131(1)(A), Bogoni v. Gomez, 847 F. Supp. 2d 519, 524 (S.D.N.Y. 2011).  In addition, a defendant is absolutely immune from liability pursuant to 15 U.S.C. § 8131(1)(B), which protects registrants where the name that is the basis for the domain name "is used in, affiliated with, or related to a work of authorship" protected by copyright law "if the person registering the domain name is the copyright owner . . . [and] intends to sell the domain name in conjunction with the lawful exploitation of the work."

The Court noted in Bogoni that there is very little case law interpreting § 8131(1)(A). However, the Eastern District of Virginia, in Carl v. Bernardjcarl.com, 662 F. Supp. 2d 487 (E.D.Va. 2009), provided guidance in dismissing a cyberpiracy claim under this statute.  In Carl, 662 F. Supp. 2d at 497-98, the Court dismissed a claim under 15 U.S.C. § 8131 because the complaint failed to allege a violation of the statute when it merely alleged that the defendants intended that the plaintiff pay them money to settle a debt.

Courts, in deciding upon 15 U.S.C. § 8131 claims, have consistently relied on the statutory language and interpretive case law under the related cyberpiracy statute, 15 U.S.C. § 1125(d), which also requires an element of "a bad faith intent to profit," and was also enacted

under the ACPA.  <u>Bogoni</u>, 847 F. Supp. 2d at 524. ("statutes are so strikingly similar that the

Court considers the factors listed in § 1125(d) to be helpful in conducting the inquiry required"

in analyzing "specific intent" under the ACPA).   Thus, in determining whether to dismiss

Plaintiff's § 8131 claim, this Court should consider the interpretative authority under § 1125(d).

To prevail under 15 U.S.C. § 1125(d), a plaintiff must show that the defendant:

(i)      has a bad faith intent to profit from [a mark]; and
(ii)     registers, traffics in, or uses a domain name that-
(I)      in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; (II) in the case of the famous mark that is famous at the  time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark.

<u>Venetian Casino Resort, LLC v. VenetianGold.com, 380 F. Supp. 2d 737 (E.D.Va. 2005); see</u>

<u>also Lamparello v. Falwell</u>, 360 F. Supp. 2d 768, n. 18 (E.D. Va. 2004).  A plaintiff must also

show that the defendant had "a bad faith intent to profit from using the domain name at issue."

<u>Id</u>. 15 U.S.C. § 1125(d)(1)(B) provides the following factors to consider in determining the

existence of bad faith:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain

15

names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous....

However, bad faith intent may "not be found in any case in which the court determines that the person believed, and had reasonable grounds to believe, that the use of the domain name was a fair use or otherwise lawful." Id., 15 U.S.C. § 1125(d)(B)(ii).

The Eastern District of Virginia, in deciding a claim under § 1125, has cautioned that the scope of the cybersquatting statutes is narrow. Harrods Ltd. v. Sixty Internet Domain Names, 110 F. Supp.2d 420, 426 (E.D. Va. 2000)(rev'd in part on other grounds, aff'd in part, 302 F.3d 214). Consequently, courts have established a high bar for proving specific or bad faith intent to profit, typically finding it only in cases where the sale price demanded, if any, is "exorbitantly beyond the Domain Names' actual value to anyone other than the plaintiff," which courts have held is "strongly probative of a specific intent to profit." See Bogoni, 847 F. Supp. 2d at 524; see also Schmidheiny v. Weber, 285 F. Supp. 2d 613, 628 (E.D. Pa. 2003). Where, as here, a site's clear purpose is noncommercial, and is primarily to provide criticism or parody, lacking "an overt commercial purpose," it "constitutes fair use" and should generally not be found to have been registered in bad faith. Utah Lighthouse Ministry v. Found. For Apologetic Info. & Research, 527 F.3d 1045, 1058 (10th Cir. 2008); see also TMI, Inc. v. Maxwell, 368 F. 3d 433 (5th Cir. 2004) at 437-38 (finding that website critical of Plaintiff and using Plaintiff's trademark as its domain name was noncommercial despite section of website dedicated to reviews of other tradespeople). It is undisputed the domain name at issue here was noncommercial – it "provided no goods or services, earned no revenue, and had no direct links to any commercial sites." Id. at 1052.

Even where a bad faith intent or specific intent to profit has been found in the absence of a specific demand for payment, that finding has occurred only after the website prominently directed visitors to contact the defendant directly, combined with testimony from both the defendant himself and a third party that he had expressly stated he was keeping the domain name "to use it as leverage in order to get the money he said [Plaintiff] owed him." <u>DSPT Int'l, Inc. v. Nahum</u>, 624 F.3d 1213 (9th Cir. 2010). Here, by contrast, there is no evidence at all that Defendants' registration or continued ownership of the domain name was intended to obtain "leverage" over Zinner. Instead, at most, the only evidence Zinner may rely on is a single voicemail from an attorney suggesting that Defendants had an "interest" in selling the domain name, which was left only in response to Zinner's demands to strip the domain name of its anonymity protections. (Ex. 5, 11/24/14 Zinner Dep. Tr. 15:6-9; Ex. 4, Brown Dep. Tr. 36:6-12, 53:25-54:1; <u>see also</u> Ex. 1, 8/28/14 Olenych Dep. Tr. 50:7-17 and Ex. 3, 11/24/14 Olenych Dep. Tr. 112:20-22).

The bar for a successful cyberpiracy claim in this Court, however, is even higher. Unlike the 9th Circuit, this Court has held that registration of a domain name with the intent that "plaintiff pay [defendant] money to settle an alleged debt" is not an "intent to profit" within the meaning of the statute. <u>Carl v. Bernardjcarl.com</u>, 662. F.Supp. 2d 487, 498 (E.D.Va. 2009)(vacated in part on other grounds but affirmed as to ruling on cyberpiracy and trademark claims, 409 Fed. Appx. 628 (4th Cir. Dec. 3, 2010)). The facts in this case demonstrate that Defendants did not intend to profit from the website and had a reasonable belief that the registration and use of the website to "tell the truth" about Zinner, was lawful.

The only fact that Zinner has ever pointed to as actual evidence of any alleged "intent to profit" at all is the existence of a March 28, 2014 voice mail message from an attorney named

17

Justin Fernandez purporting to represent the owner of the domain name. (Ex. 5, 11/24/14 Zinner Dep. Tr. 15:6-9; Ex. 4, Brown Dep. Tr. 36:6-12, 53:25-54:1). That voice mail states only that the attorney represents someone "interested" in selling the domain name. (Ex. 17).

The voicemail contains no particular offer to sell the domain name, and Zinner's own attorney, Samuel Brown, acknowledged that Fernandez never made any specific demand or offer to sell the domain name in their subsequent conversations. (Ex. 4, Brown Dep. Tr. 50:16-20). To the knowledge of the undersigned, a mere expression of "interest" in selling something has never been held to constitute an "intent" to do so. This is particularly true, where, as here, Plaintiff knowingly sought out the contact at issue, and the only evidence of an alleged "intent to sell" is that someone purporting to represent Defendants contacted Plaintiff in response to Plaintiff's demands. (Ex. 5, 11/24/14 Zinner Dep. Tr. 15:6-9; Ex. 4, Brown Dep. Tr. 35:23-25; 36:6-12, 53:25-54:1; see also Ex. 1, 8/28/14 Olenych Dep. Tr. 50:7-17 and Ex. 3, 11/24/14 Olenych Dep. Tr. 112:20-22).

Yet this is precisely what Zinner seeks to do here by relying entirely on the March 28, 2014 voicemail as evidence of the alleged "intent to profit" even though that voicemail was left only after Zinner had actively solicited the contact. There is no dispute that this voicemail was left only after Zinner had taken numerous steps to attempt to strip the domain name of its anonymity protections. Notably, Zinner has never identified any legal basis for his demands that Defendants' anonymity be stripped despite his threats of litigation against the domain registrar, Tucows, Inc., and explicitly acknowledged that he had no basis for his threats of litigation against ICANN to have the domain's registration cancelled. (Ex. 5, 11/24/14 Zinner Dep. Tr. 16:4-17:16). It is further clear that Tucows in fact was attempting to abide by Zinner's demands, even though domain registrars have a right to protect the anonymity of their registrants in ACPA

18

cases.  See Solid Host, NL v. Namecheap, Inc., 652 F. Supp.2d 1092, 1110 (C.D. Cal. 2009).  (A plaintiff cannot manufacture a defendant's "bad faith intent to profit" by initiating the contact that leads to the alleged offer.)  Cf. Radio Computing Servs. v. Roland Computing Servs., 66 U.S.P.Q.2d (BNA) 1478 (S.D.N.Y. 2003)(ruling, as a basis for granting a motion to dismiss for lack of personal jurisdiction, that defendant's alleged offer to sell domain name in response to inquiry from plaintiff was insufficient to demonstrate that defendant registered domain name "for the purposes of extorting money.").

    At most, this voicemail is thus little more than an attempt to settle the dispute as to whether Defendants' anonymity could be stripped, which would render the voicemail inadmissible.  Federal Rule of Evidence 408(a).  Even if admissible, the voicemail would fall far short of the standard for proving either a "bad faith" or "specific" intent to profit.  This is particularly true here, as this Court has specifically held, and the Fourth Circuit has affirmed, that the use of a domain name to leverage settlement of a separate dispute between the parties does not constitute either "bad faith" or "specific" intent to profit.  Carl, 662 F. Supp. 2d at 498. Other courts have held that consideration of conduct during an attempt to settle a dispute regarding a domain name to establish a "bad faith" intent to profit constitutes reversible error. TMI, Inc., 368 F. 3d 433 (5th Cir. 2004)(reversing trial court's grant of judgment to plaintiff and granting judgment to defendant where sole evidence of bad faith was defendant's conduct during and after settlement discussions).  Moreover, regardless of whether it is construed as an attempt to settle a previous dispute, such a mere expression of "interest" in selling, conveyed through an attorney, falls far short of the evidence required to establish any intent to profit, much less a "specific" or "bad faith" intent to do so.

Furthermore, intent to profit for purposes of Zinner's claim must be established as of the date a domain name is acquired, and must be a specific or bad faith intent. This conclusion is clear from the text of 15 U.S.C. § 8131, which provides for civil liability for one "who registers a domain name . . . . with the specific intent to profit from such name by selling the domain name for financial gain" where that domain name consists of the name of another living person. The "intent" that is relevant for purposes of such cybersquatting claims are thus established as of the act of registering the domain name. Section 8131 does not provide for liability for one who registers a domain name in good faith but then subsequently decides to sell the domain name for independent reasons.[1]  Because the only evidence Plaintiff has produced in support of his assertion that Defendants had <u>any</u> intent to profit through the website was the phone call Zinner himself solicited nearly a month <u>after</u> the domain was registered, there could have been no "intent to profit" at all with respect to Zinner's ACPA claim. As such, Zinner's claims should be dismissed because he cannot establish <u>any</u> intent to profit, much less that Defendants possessed such an intent in "bad faith" and thus summary judgment is appropriate.

Additionally, the clear majority of the nine enumerated factors in 15 U.S.C. § 1125(d)(1)(B) should weigh strongly against a finding of bad faith intent:

- Factor IV (noncommercial or fair use): Olenych had a right to write about Zinner protected not only by the First Amendment of the United States Constitution but also copyright law, providing him with at least some intellectual property interest in the domain name. Furthermore, Defendants used, and intended to use, the domain name

---

[1] By contrast, cybersquatting under the Lanham Act permits liability where there is a bad faith intent to profit in the domain name by anyone who "registers, traffics in, or uses" the domain name. 15 U.S.C. § 1125(d)(1)(A). However, as discussed *infra*, the Lanham Act claim must fail because Zinner did not have a protectable trademark in his name, in addition to the fact that Zinner cannot demonstrate Defendants ever possessed a "bad faith intent" to profit.

for noncommercial commentary on Zinner, which is both protected by the First Amendment and fair use under trademark law. <u>Utah Lighthouse</u>, 527 F.3d at 1058.

- Factor V (likelihood of confusion): It is also inconceivable that, given the content explicitly and vociferously criticizing Zinner, someone visiting the domain name would have been confused or concluded that the site was "sponsor[ed], affiliate[ed], or endors[ed]" by Zinner.

- Factor VI (offer to sell domain name or pattern of offers to sell other domain names): As discussed, *supra,* Defendants never offered to sell the domain name in any meaningful sense. Although Defendants own up to 20 domain names, there has never been any suggestion that they ever attempted to sell any of those other domain names, and the only other domain name they own which contains a personal name is "dickolenych.com." (Ex. 1, 8/28/14 Olenych Dep. Tr. 51:3-17).

- Factor VII (false contact information in registration of domain name): Zinner himself has also conceded that Olenych initially provided accurate contact information to the domain registrar, changing this information only briefly when Zinner and his attorney were threatening to file suit against the registrar unless it stripped the domain name of its anonymity protections. (Ex. 1, 8/28/14 Olenych Dep. Tr. 53:15-18, 55:18-23; Ex. 4, Brown Dep. Tr. 24:13-4; Exs. 15 and 16)).

- Factor VIII (acquisition of multiple confusingly similar domain names): No other domain name owned by Defendants has been alleged to be likely to cause confusion as to its affiliation with another person or a famous mark.

- Factor IX (distinctiveness and fame of allegedly infringed mark): As discussed in Part II, *infra*, Zinner's name does not possess any secondary meaning and thus is neither distinctive nor famous.

Where this many factors weigh against a finding of bad faith, courts have not hesitated to grant judgment in favor of a defendant on a plaintiff's cybersquatting claims. See TMI, Inc., 368 F. 3d at 440 (granting judgment to defendant where five of nine statutory factors weighed in defendant's favor).

In addition, Defendants are entitled to summary judgment pursuant to 15 U.S.C. § 8131(1)(B), which protects registrants where the name that is the basis for the domain name "is used in, affiliated with, or related to a work of authorship." It is indisputable that, at the time Defendants registered the domain name, Olenych was drafting a fictionalized novel about his history with Zinner. (Ex. 1, 8/28/14 Olenych Dep. Tr. 34:15-25). Olenych has further testified that, at least in part, he hoped to use the website to eventually market his book. (Ex. 1, 8/28/14 Olenych Dep. Tr. 37:5-10). This testimony is unrefuted.

Based upon the foregoing, Defendants Olenych and Lone Tree are entitled to summary judgment in this matter because no material facts are in dispute from which the court might find that Defendants possessed a bad faith or specific intent to profit and had registered the domain name related to Olenych's work of authorship and to exercise his First Amendment Rights.

22

**POINT II.**

**THIS COURT SHOULD DISMISS COUNT II ASSERTING CLAIMS UNDER 15 U.S.C. § 1125(d)**

Zinner's claim under 15 U.S.C. § 1125(d) must also be dismissed because he cannot show he had a valid trademark or that Defendant had acted in bad faith with intent to profit.  As noted previously, a plaintiff must show under section 1125(d) that the defendant:

> (i)     has a bad faith intent to profit from [a mark]; and
> (ii)    registers, traffics in, or uses a domain name that-
> (II)    in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; (II) in the case of the famous mark that is famous at the  time of registration of the domain name, is identifical or confusingly similar to or dilutive of that mark.

Venetian Casino Resort, LLC v. VenetianGold.com, 380 F. Supp. 2d 737 (E.D.Va. 2005); see also Lamparello v. Falwell, 360 F. Supp. 2d 768, n. 18 (E.D. Va. 2004).  In order to prevail, Zinner must show he has a valid trademark, which he cannot do.  Id.  In addition, a plaintiff must also show that the defendant had "a bad faith intent to profit from using the domain name at issue."  Id.  As noted previously, Zinner cannot demonstrate bad faith in consideration of the elements set forth in 15 U.S.C. § 1125(d)(1)(B), which provides explicit guidance that the factors articulated therein must be evaluated to determine the existence of bad faith.

Zinner's claim under 15 U.S.C. § 1125(d) also fails because he cannot satisfy the additional element for such a claim, namely that his personal name be "protected as a mark" under the Lanham Act.   15 U.S.C. § 1125(d)(1)(A).   Defendants are entitled to summary judgment on the trademark cybersquatting claim because Zinner does not possess a valid trademark in his name, and his name is thus not "protected as a mark" under the Act.

Where an alleged trademark is a personal name, it is automatically "included in the class of common words that may not secure protected trademark status until secondary meaning has

attached." Flynn v. AK Peters, Ltd., 377 F. 3d 13, 20 (1st Cir. 2004). A showing of secondary meaning requires that a plaintiff demonstrate that "a substantial portion of the consuming public associates [the mark] specifically with [the plaintiff's] business." Id. at 20. It exists only where "the primary meaning of the tradename as identifying an individual is overshadowed in the mind of the consuming public by the origin or quality of the product or service marketed under the name." John Curry Skating Co. v. John Curry Skating Co., 626 F. Supp. 611, 615 (D.D.C. 1985).

This Court has similarly ruled that a plaintiff may not assert that his name is a "protectible mark" if the supposed "mark" "serves merely to identify plaintiff as a person . . . and not a business or service itself." Carl v. Bernardjcarl.com, 662 F. Supp. 2d 487, 495 (E.D. Va. 2009). Instead, it is the plaintiff's burden to prove secondary meaning, which "entails vigorous evidentiary requirements." Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990). The secondary meaning must be established "prior to the time when the defendant entered the market," and six factors are relevant to the secondary meaning inquiry, namely: "(1) advertising expenditures; (2) consumer studies linking the mark to the source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." Id.

Although Zinner has a pending trademark application with the USPTO, that application has not been officially registered at this time. (Exs. 20 and 21). Even if Zinner's application is registered prior to the date this Court decides the instant motion, that registration would not provide Zinner with a presumption of secondary meaning, because a personal name mark may be registered by the USPTO "without a showing of secondary meaning." Brooks v. Creative Arts By Calloway, LLC, 93 U.S.P.Q.2d (BNA) 1823. Regardless, the secondary meaning necessary

to sustain a cybersquatting claim under the Lanham Act must have been established "at the time of registration" of the domain name. <u>Carl</u>, 662 F. Supp. 2d at 497.  As Zinner did not even file his application with the USPTO until nearly a month after the domain name here was registered, he clearly may not rely on any outcome of that application to avoid his burden of demonstrating secondary meaning in this matter.

Zinner has produced no evidence whatsoever to support the notion that his name has acquired a "secondary meaning" in the performance of live music, as his trademark application requests, nor for any other purpose.  He has not produced evidence of any advertising expenditures under his own name, nor has he produced a single consumer study, any evidence of sales success under his own name, unsolicited media coverage of business transacted under his own name, nor any attempts by others to plagiarize his "mark" by transacting business under his name.  Indeed, Zinner has not produced any evidence that he has *ever* "used" his personal name to transact business in any sense.  To the contrary, he has acknowledged that, since at least the 1990s, he has performed music almost exclusively as part of a band or group, and even then only earned two or three thousand dollars as a live musician in 2013. (Ex. 2, 9/25/14 Zinner Dep. Tr. 242:10-15, 245:2-4).  He also acknowledged that "there's no reason" his name would even appear on a contract for a performance by one of his bands.  (Ex. 2, 9/25/14 Zinner Dep. Tr. 260:23-261:3).  He has not asserted that he has used his personal name to identify any other services or products he or his business endeavors provides, much less that it has acquired secondary meaning in connection with other services or products.

This is identical to the situation addressed in <u>Carl</u>, where this Court concluded the plaintiff did not establish secondary meaning in his name because the allegations established only that the plaintiff was a principal in a business, rather than "a business or service itself."

Carl, 662 F. Supp.2d at 495.   As in Carl, Zinner has not established that he "advertised . . .
services under his own name, nor . . . that [he] has successfully operated under the mark in the
past." Id.  As such, Zinner cannot establish that his personal name possesses secondary meaning,
and the defendants are entitled to summary judgment on his claim under 15 U.S.C. § 1125(d)
regardless of whether the defendants are entitled to summary judgment on the claim under 15
U.S.C. § 8131.

      For the same reasons that Zinner cannot establish bad faith with intent to profit on the
part of the defendants under 15 U.S.C. § 8131, Zinner also cannot establish this element of proof
under 15 U.S.C. § 1125(d).   Defendants obtained the domain name for non-commercial use to
exercise their First Amendment Rights to provide commentary about Zinner.   There was never
any intent to sell the domain name at the time it was registered, and there was only a vague
reference to selling the domain name once the privacy protections were being removed from the
registration, and in view of Zinner's history of litigation and threat to sue when contacting
Tucows.   Thus, Zinner cannot meet this additional burden of establishing a claim under section
1125(d), and therefore this action must be dismissed.

      Based upon the foregoing, Zinner's claim under 15 U.S.C. § 1125(d) should be
dismissed, with prejudice.

## POINT III.

**PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF DAMAGES BECAUSE ZINNER IS NOT ENTITLED TO SUCH RELIEF UNDER 15 U.S.C. §§ 8131 AND 1125(d)**

Defendants are entitled to summary judgment on Zinner's claim for damages, in any event. No damages are ever available for claims arising under 15 U.S.C. § 8131, and Zinner's failure to timely register his alleged trademark in his personal name is an automatic bar to damages under 15 U.S.C. § 1125(d).

*A. No Damages Are Available for Personal Name Violations under 15 U.S.C. § 8131*

Zinner's personal name infringement claim, pursuant to 15 U.S.C. § 8131, cannot form the basis for any award of damages. Section 8131 explicitly limits the remedies available thereunder to "injunctive relief, including the forfeiture or cancellation of the domain name or the transfer of the domain name to the plaintiff. The court may also, in its discretion, award costs and attorneys fees to the prevailing party." The only other potential authority for an award of damages would be 15 U.S.C. § 1117, which is the general damages statute governing trademark and ACPA claims. However, § 1117 provides for compensatory damage awards only for violations of 15 U.S.C. §§ 1125(a) and (d), and willful violations of 15 U.S.C. § 1125(c). In addition to the fact that the statute plainly restricts the remedies available to plaintiffs under 15 U.S.C. § 8131 to injunctive relief and a request for fees, counsel for Defendants are not aware of a single case in this district or any other district in which damages have been awarded on a claim under 15 U.S.C. § 8131. Thus, the only relief available to Zinner should he prevail only on the personal name infringement claim is injunctive relief combined with the possibility of a discretionary award of attorney fees and costs.

### B. Damages Are Also Unavailable for Zinner's Claim Under 15 U.S.C. § 1125(d)

As discussed, *supra,* Zinner's claim under 15 U.S.C. § 1125(d) cannot survive summary judgment not only because Zinner has failed to demonstrate that Defendants had any intent to profit, but also because he has wholly failed to produce any evidence whatsoever that he possesses a valid trademark in his personal name. Yet even if Zinner could somehow survive summary judgment on this claim, he would not be entitled to damages because he indisputably failed to register prior to Defendants' alleged registration of the domain name, or even prior to the filing of the instant suit. Indeed, as of the filing of the instant motion, Zinner's proposed trademark is still not registered. Where a plaintiff files suit under the cyberpiracy provisions of the Lanham Act alleging a trademark in his personal name, he "is not entitled to recover damages" where he has failed to show that his personal name "acquired a secondary meaning at the time" the domain name was registered or that he has "formally registered the mark with the U.S Patent and Trademark Office." Carl, 662 F. Supp. 2d at 497. As such, Defendants are entitled to summary judgment on the question of damages even if Zinner's injunctive relief claims somehow survive.

## CONCLUSION

In consideration of the foregoing, Defendants are entitled to summary judgment and this action should be dismissed in its entirety, with prejudice.

**WONG FLEMING**

Dated: December 31, 2014

By: */s/ Mark W. Thompson*
   Mark W. Thompson, Esq.
   VA Bar # 66750

By: _____
   Linda Wong, Esq. (*admitted pro hac vice*)

821 Alexander Road, Suite 200
Princeton, New Jersey 08540
Tel.: (609) 951-9520
Fax: (609) 951-0270
*Attorneys for Defendants Richard P. Olenych and Lone Tree Printing, Inc.*

29

## CERTIFICATE OF SERVICE

I, Mark Thompson, hereby certify that on this 31st day of December, 2014, I caused a true

and correct copy of the foregoing Motion for Summary Judgment and Brief in Support, as well

as its supporting Exhibits, to be served on the following via Certified First Class Mail:

Louis N. Joynes, II
Joynes & Gaidies
564 Lynnhaven Parkway
Suite 100
Virginia Beach, VA 23452

Dated: December 31, 2014             /s/ Mark W. Thompson
                                     Mark W. Thompson, Esq.
                                     VA Bar # 66750
                                     821 Alexander Road, Suite 200
                                     Princeton, New Jersey 08540
                                     Tel.: (609) 951-9520
                                     Fax: (609) 951-0270
                                     *Attorneys for Defendants Richard P. Olenych*
                                     *and Lone Tree Printing, Inc.*